**In re DOW CORNING CORPORATION, Debtor.**

No. 95–CV–72397–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 12, 1995.

Order Supplementing Decision
Sept. 14, 1995.

## MEMORANDUM OPINION AND ORDER ON THE DEBTOR DOW CORNING'S MOTION TO TRANSFER

HOOD, District Judge.

### I. INTRODUCTION/FACTS:

This matter is before the Court on the Debtor Dow Corning Corporation's motion to transfer certain breast implant cases to the United States District Court, Eastern District of Michigan pursuant to 28 U.S.C. § 157(b)(5). Responses were filed and a hearing was held on the matter.

At the onset, the Court is very cognizant of the rights of the claimants involved in this matter under our judicial system as well as the protections afforded to the Debtor Dow Corning under our bankruptcy laws. With these sometime competing interests in mind, the Court has attempted to balance the rights of both the Debtor and the claimants in its decision.

On May 15, 1995, the Debtor, Dow Corning Corporation, sought a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court of the United States District Court, Eastern District of Michigan, Northern Division in Bay City, before the Honorable Arthur J. Spector. On June 12, 1995, the Debtor filed a motion to transfer certain breast implant cases before the Bankruptcy Court. Judge Spector entered a Determination and Report and Recommendation Regarding the Debtor's Motion to Transfer on June 13, 1995 indicating that the District Court had jurisdiction over this motion. On July 5, 1995, this Court entered an order provisionally transferring the opt-out breast implant cases involving the Debtor only to the Eastern District of Michigan pending a hearing scheduled for the motion on July 31, 1995.

Debtor is a leading producer of silicone products. Dow Corning was formed in 1943 as a corporation owned by Corning Incorporated and Dow Chemical Company (each has a 50% ownership interest) to develop and produce silicones and silicone products during World War II. In 1994, the Debtor Dow Corning's total sales were nearly $2 billion. The Debtor manufactured breast implants for commercial use from approximately 1964 until 1992. During a part of this time, the Debtor also supplied certain raw materials to other breast implant manufacturers. According to the Debtor, in the year of its highest sales in 1991, breast implants only accounted for less than 1% of the Debtor's sales.

Silicone gel breast implants consist of a silicone elastomer "envelope" filled with silicone gel. The implants are surgically implanted for purposes of breast reconstruction in breast cancer patients and for cosmetic reasons. These implants have the same chemical make up as silicone materials used to make catheters, shunts, pacemaker leads and other medical devices.

In the early 1980s, silicone breast implants were subject to occasional product liability lawsuits. By 1987, 50 such lawsuits had been filed. In 1990 and 1992, over 100 lawsuits were filed against the Debtor. However, beginning in 1992, the implant litigation drastically increased. Over 3,000 suits were filed against the Debtor in 1992, over 8,000 in 1993

and over 7,000 in 1994. The litigation included both individual claims and actions on behalf of putative classes. By early 1995, the Debtor was a Defendant in 45 putative class action lawsuits (31 in various federal district courts, 12 in state courts and 2 in Canada) and over 19,000 individual lawsuits. All the suits combined involved more than 36,000 claimants. The Debtor was sued both as the manufacturer of breast implants and supplier of silicone raw materials to other breast implant manufacturers.

According to the Debtor, these claims uniformally allege that breast implants cause diseases, including autoimmune disease, scleroderma, systemic disorders, joint swelling and chronic fatigue. The damages sought in these cases are substantial, ranging from hundreds of thousands to tens of millions of dollars in compensatory and punitive damages. Claims involving mechanical defects, including rupture of the implants, are also alleged by the claimants.

In June 1992, pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multi District Litigation ("MDL") ordered that federal actions involving breast implants be transferred to the Honorable Sam C. Pointer in the Northern District of Alabama for coordinated or consolidated pretrial proceedings ("MDL No. 926"). *In re Silicone Gel Breast Implants Products Liability Litigation,* MDL No. 926, 793 F.Supp. 1098 (J.P.M.L. 1992).

The Debtor asserts that as that litigation progressed, so did efforts to achieve a global resolution of this controversy. Although the Debtor contends that its products were safe and did not cause the diseases being claimed, it was compelled to recognize that its resources were not unlimited and that the litigation was diverting management's attention from the company's core businesses and that the costs of continued litigation would be substantial. According to the Debtor, in 1994, its litigation costs exceeded $200 million.

After months of negotiations with co-defendants and claimants, a court-approved "Steering Committee" representing breast implant claimants, the Debtor and other implant manufacturers entered into a "global settlement" of breast implant claims on March 23, 1994. The Debtor agreed to contribute up to $2.02 billion (out of a total settlement of $4.25 billion) of the funding required by the settlement. Judge Pointer approved the settlement as fair and reasonable in a September 9, 1994 Order after certifying one of the consolidated federal actions as a class action for purposes of settlement under Fed.R.Civ.P. 23(b)(3).

It appears that the global settlement did not resolve the controversy and the future of that agreement, at this time, is in question. First, the Agreement is oversubscribed in that the claims being made against the established funds exceed the Defendants' funding commitments. Second, numerous claimants have opted not to participate in the settlement, electing instead to pursue individual suits. As of May 1995, over 6,000 claimants had opted out of the global settlement and are pursuing individual actions ("opt-out" claimants). The Debtor asserts that it cannot both fund the settlement and continue to incur substantial litigation costs in connection with the opt-out claimants. These opt-out claims which led to costly proceedings in state courts, are a major reason for the Debtor's decision to seek bankruptcy protection, according to the Debtor.

In early 1992, the Food and Drug Administration ("FDA"), asked for a voluntary moratorium on the production of breast implants. Since that time, the Debtor has tried to verdict six breast implant cases involving nine claimants. The jury returned a verdict in favor of the Debtor in three of the cases; in favor of the plaintiffs in two of the cases; and in the sixth case, involving two plaintiffs, the jury found in favor of one plaintiff and against the other. According to the Debtor, none of the juries have awarded punitive damages in the post-moratorium trials.

The Debtor asserts that breast implant trials are time-consuming. Complex scientific evidence is involved in various scientific fields. The above trials ranged in length from two to eleven weeks, excluding months of preparation that preceded each trial. According to the Debtor, the central issue was the same: whether silicone gel breast im-

plants cause disease. The Debtor asserts that the complexity of the cases placed at a substantial disadvantage its efforts to deal with the opt-out claims which were being pursued in state courts. The state proceedings were uncoordinated and trial dates were overlapping. When it filed for bankruptcy protection, the Debtor faced approximately ninety trials over the next six months, including seven trials with twenty-eight plaintiffs in Texas during the month of June 1995. From the Debtor's perspective, these conflicting trial settings created frantic conditions that made it impossible to fairly, rationally, and efficiently resolve the central scientific issue of whether implants cause the diseases that are alleged. The Debtor states that it could not succumb to exorbitant settlement demands nor could it go to trial knowing that it could not muster the resources necessary to mount an effective defense on so many fronts simultaneously. The Debtor claims it was forced to seek bankruptcy protection under Chapter 11 of the Bankruptcy Code. However, despite the Chapter 11 proceedings and the automatic stay provisions of 11 U.S.C. § 362, the breast implant litigations are still ongoing. Plaintiffs throughout the United States have filed notices of nonsuit against, dismissals of and motions to sever the Debtor in order to proceed to trial against Dow Chemical Co. and/or Corning, Inc. In June and July 1995, suits against Dow Chemical and/or Corning were set for trial in numerous counties throughout Texas.

The Debtor has envisioned essentially a four-step process in its reorganization proceedings. The Debtor's proposal claims to have taken into account the substantive and procedural rights of the opt-out claimants and also ensures the integrity of the bankruptcy proceeding. The first step is the removal to local federal district courts of state opt-out claims involving the Debtor's implants pursuant to 28 U.S.C. § 1452(a). The second step is the instant motion to transfer, which seeks to have all of the opt-out actions then transferred to the Eastern District of Michigan. Should the second step be granted, the third step is a motion to consolidate the transferred claims and an early trial on the threshold issue of whether implants cause the diseases being claimed

pursuant to Fed.R.Civ.P. 42. The Court would oversee a consolidated, adversary trial that would focus on the scientific evidence as it relates to the core issue of causation which would be binding on all opt-out claimants. The fourth step is for the bankruptcy court to conduct an estimation or other valuation proceeding, taking into account the results of the threshold trial on causation, and to approve a plan of reorganization that is consistent with that determination. Additional proceedings may be thereafter determined by the Court at the conclusion of the estimation or valuation proceedings, taking into account the bankruptcy court's plan of reorganization.

The Official Committee of Tort Claimants ("Tort Claimants" or the "Committee") asserts in its brief in opposition to the Debtor's Motion to Transfer that Dow Chemical and the Debtor knew of and concealed from the public substantial data suggesting that silicones were dangerous to the human body. Notwithstanding the Debtor's and its parents' repeated assurances to the public that its products were safe, jury awards, settlements and a very large proposed class settlement reflect that thousands of women have suffered injuries as a result of receiving the implants. The Committee asserts that apart from the issue of disease causation, many breast implant recipients have been injured and often horribly scarred by the rupturing or leaking of implants. Countless others fear that their implants may rupture or leak in the future. These women either have had or will need to have costly and painful "explanation" surgery to remove their implants and are entitled to substantial damages regardless of whether the leaking silicone also caused a "disease." The Committee further asserts that the incidence of various conditions varies with each woman depending on their particular medical history and biological characteristics.

According to the Committee, several juries of the United States have entered verdicts, ranging into the millions of dollars, holding the Debtor liable for injuries caused by its breast implants. The Committee asserts that the Debtor hopes to wipe out these judgments and this history should it prevail

in one consolidated trial in this District and eliminate its liability to tens or hundreds of thousands of injured women.

The Committee states that while the global settlement approved by Judge Pointer of over $4 billion is sizable, it is insufficient to compensate the plaintiffs for the injuries they have suffered. In a report released on June 15, 1995 by the claims administrator appointed by Judge Pointer to implement the global settlement, Texas State Court Judge Ann Cochran, 440,000 women have registered under the settlement as potential claimants.

In its Motion to Transfer, the Committee asserts that the Debtor has wreaked procedural havoc by removing numerous pending state court cases to federal courts. Many of these cases have subsequently been transferred to Judge Pointer as "tag-along" cases by the MDL Panel. These cases join the more than 10,000 actions earlier transferred to Judge Pointer pursuant to the MDL Panel's determination that joint pretrial proceedings before a single court that could develop substantial expertise would conserve resources and best serve the interests of all parties. According to the Committee, the Debtor's attempt to transfer all opt-out actions to this Court would run roughshod over the considered judgments of the MDL Panel and unnecessarily place this Court on a collision course with Judge Pointer. The Committee asserts that Judge Pointer has acquired an intimate and unrivaled familiarity with the breast implant litigation since presiding over the consolidated pre-trial proceedings in the thousands of pending federal breast implant suits in June 1992. Judge Pointer has supervised discovery that has included approximately 225 depositions and production of some 10 million pages of documents and has presided over complex and lengthy proceedings to approve and implement the global settlement since spring 1994.

The Committee further asserts that the Debtor's parent corporations, Dow Chemical and Corning, Inc. are merely trying to ride the coat tails of the Debtor's bankruptcy proceedings in order to benefit from the Debtor's protection under the bankruptcy laws.

The issues before the Court are: 1) whether it has jurisdiction to transfer the claims involving the Debtor; 2) if the Court does have jurisdiction to transfer the claims, whether the Court should abstain from exercising its authority; and 3) whether it has jurisdiction over the claims against the Shareholders.

II. *ANALYSIS:*

A. *Whether this Court has the jurisdiction and authority to transfer the cases to the E.D. of Michigan pursuant to 28 U.S.C. § 157(b)(5).*

▪ It is undisputed that the Debtor's bankruptcy case is pending before the Bankruptcy Court, of the United States District Court, Eastern District of Michigan. This Court has original and exclusive jurisdiction of the Debtor's title 11 action pursuant to 28 U.S.C. § 1334(a). 28 U.S.C. § 157(b)(5) provides that this District Court has the authority to determine the trial venue of any personal injury tort claims involving the Debtor:

(5) The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

Personal injury and wrongful death claimants are specifically subject to the overarching bankruptcy policy of centralizing mass tort litigation so that the claimants' jury trial rights are preserved. *Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). Section 157(b)(5) treats personal injury claims as a special class within the realm of bankruptcy law. *Calumet Nat'l Bank v. Levine,* 179 B.R. 117, 120 (N.D.Ind. 1995). This section confers enlarged powers upon the district court where the bankruptcy action was filed to fix venue of personal injury claims *Baumgart v. Fairchild Aircraft Corp.,* 981 F.2d 824, 832 (5th Cir.1993), *cert. denied,* —— U.S. ——, 113 S.Ct. 2963, 125 L.Ed.2d 663 (1993). The district court where the bankruptcy action was filed has the sole authority for ultimately fixing the trial venue

for personal injury actions against the bankruptcy debtor. *Calumet,* 179 B.R. at 123.

B. *If this Court does have jurisdiction, whether this Court has the authority to transfer certain opt-out claims from the MDL panel, Case No. 926 and MDL Judge in the N.D. of Alabama to the E.D. of Michigan.*

The Tort Claimants argue that the MDL Panel's previous order preempts this Court's authority to transfer certain opt-out claims from the MDL Panel, Case No. 926 to this Court. Other responses and objections filed with this Court have also argued that this Court has no authority to transfer cases from other districts and that only those district courts have the authority to transfer cases. Generally, the district court where the suit is pending has the sole authority to transfer a suit. However, with regards to a bankruptcy action where personal injury tort claims are involved, the Fourth Circuit in *In re A.H. Robins Co., Inc.,* 788 F.2d 994 (4th Cir.1986), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986), stated:

... As the appellants correctly construe [28 U.S.C.] section 1412, the authority to transfer a suit under that statute rests solely with the court in which the suit is pending and it provides no authority whatsoever to a district court sitting in bankruptcy in one district and having jurisdiction of the bankruptcy to transfer the venue of a case against the bankrupt to another district. Section 157(b)(5), however, expressly confers on the district court sitting in bankruptcy and having jurisdiction of the bankruptcy proceedings the power to fix the venue of any tort case against the debtor pending in other districts. The purpose of this latter statute, was, as Congressman Kastenmeir declared, to centralize the administration of the estate and to eliminate the 'multiplicity of forums for the adjudication of parts of a bankruptcy case.' (cite omitted) That purpose would be thwarted and the plain language of section 157(b)(5) nullified if the power of the district court sitting in bankruptcy to fix the venue for tort claims against a debtor was to be preempted by the provisions of section 1412. We do not believe this to have

been the intention of Congress in enacting the two statutes. Section 157(b)(5) was drafted to cover the procedure in connection with a special group of cases, to wit, *personal injury tort claims against a debtor in Chapter 11 proceedings whenever pending and in that connection the section is supreme.* In all other cases related to the bankruptcy proceedings, however, the general statute (i.e., section 1412) would govern. This, we think, is the proper construction to be given the two statutes. It is a construction which harmonizes the two sections. It conforms to that established canon of statutory construction that '[w]e must read the statutes [in those instances where there is any possible conflict] to give effect to each if we can do so while preserving their sense and purpose.' (cites omitted) To accept the appellants' interpretation and to negate the plain language of § 157(b)(5) 'would violate the basic principle of construction that statutes should be read, if possible, as harmonious texts.' (cites omitted) We, therefore, have no difficulty in finding that *the district judge's authority to fix venue of personal injury tort actions against the debtor exists under § 157(b)(5), irrespective of the district in which such controversy is pending.* (emphasis added).

788 F.2d at 1011. In the *A.H. Robins* case, the Court went on to state that the first and primary purpose of the proceedings is to ascertain whether a fair reorganization of the debtor can be achieved. *Id.* at 1012. This purpose may well be completely thwarted if the energies of the debtor's executives and officers are initially diverted by, and the resources of the debtor are dissipated in, the expenses of litigating the trial of thousands of personal injury suits in courts throughout the land spread over an interminable period of time. *Id.* No progress along estimating these contingent claims can be made until all claims and suits are centralized before a single forum where all interests can be heard and in which the interests of all claimants with one another may be harmonized. *Id.* at 1014. However, it should be noted that *A.H. Robins* did not address a situation involving a bankruptcy court, a district court sitting in

bankruptcy, and claims previously transferred by the MDL to another district court.

The MDL has its authority to transfer "civil actions" for pre-trial proceedings under 28 U.S.C. § 1407. The MDL has recognized the bankruptcy stay against bankrupt defendants before it and those claims that have been stayed remain stayed in the transferee court of the MDL. *In re Asbestos Prod. Lia. Lit.*, 771 F.Supp. 415, 421, note 6 (J.P. M.L. 1991). The MDL Panel has noted that the transferee court should coordinate with the concerned bankruptcy courts. 771 F.Supp. at 421, n. 6. *In re Apex Oil Co.*, 980 F.2d 1150 (8th Cir.1992) also recognized that the district court sitting in bankruptcy has the authority to fix the trial venue under Section 157(b)(5) or to abstain from the suits pending before the MDL transferee court. Based on these cases, this Court has authority over the cases before the MDL that are the subject of the Debtor's motion.

C. *If this Court does have jurisdiction, whether this Court must abstain or, alternatively, exercise its discretion to abstain pursuant to 28 U.S.C. § 1334(c).*

### 1. *Mandatory Abstention.*

■ A motion under section 157(b)(5), also requires an abstention analysis. *In re Pan American Corp.*, 950 F.2d 839, 844 (2nd Cir. 1991). The Tort Claimants' brief and other Claimants' objections and responses have moved that this Court abstain under 28 U.S.C. § 1334(c).

Section 157(b)(4) provides that "[n]on-core proceedings under § 157(b)(2)(B) of title 28 [liquidation of personal injury tort or wrongful death cases], shall *not* be subject to the mandatory abstention provisions of Section 1334(c)(2)." *In re Pan Am*, 950 F.2d at 845; 28 U.S.C. § 157(b)(4). This Court is exempted from mandatory abstention under Section 1334(c)(2).

### 2. *Discretionary Abstention.*

In their responses and at oral argument, the Claimants' attorneys urged that the Court abstain from transferring all of the breast implant cases involving the Debtor to the Eastern District of Michigan, specifically opposing the Debtor's proposition to hold one trial on the issue of causation for purposes of

estimation. For the reasons more fully set forth below, the Court will not abstain its jurisdiction pursuant to 28 U.S.C. § 1334(c)(1) at this time. The Court will allow the Bankruptcy Court to proceed with the *estimation* process without holding the one causation trial requested by the Debtor.

■ Congress has indicated that courts should not be too quick to abstain from exercising their transfer powers under 28 U.S.C. § 157(b)(5). *In re Pan Am*, 950 F.2d at 845. Transfer should be the rule, abstention the exception. *Id.* The Court should weigh the advantages and disadvantages advanced at the hearing. *A.H. Robins*, 788 F.2d at 1016. Factors enumerated by the *A.H. Robins* case, include:

> ... some cases may be fully prepared and ready for state trial. Some cases may require substantial numbers of local witnesses. Claimants may be receiving critical medical, physical or psychological care in a local area which would have to be halted or transferred to Richmond. All of these factors are relevant.

*Id.* at 1016.

■ Issues of state law may also substantially affect the results in individual cases and must be considered. *Id.* The abstention doctrine manifests federal respect for State law and policy. *In re Pan Am*, 950 F.2d at 846. Section 1334(c)(1) of Title 28 of the United States Code provides for abstention by the district court in such instances:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). In *In re Pan Am*, the Court addressed two decisions by the district court involving its abstention from certain cases. *In re Pan Am* involved the Lockerbie air crash tragedy. The MDL panel had entered an order transferring all the federal cases to the Eastern District of New York. The *Pan Am* defendants subsequently filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code.

All actions against the debtors were stayed by 11 U.S.C. § 362. Shortly thereafter, the *Pan Am* defendants moved for an order pursuant to 28 U.S.C. § 157(b)(5) transferring the Florida state-court actions, known as the "Coker" and the "Rosenkranz" actions to the Southern District Court of New York, where the bankruptcy proceeding was filed. The *Pan Am* debtors contemplated that the transfer to the Southern District of New York would be followed by another transfer to the Eastern District of New York where the MDL was pending. The District Court in the Southern District of New York decided to abstain from exercising the court's transfer powers in both cases. On appeal, the Second Circuit reversed the district court's decision as to the Coker decision because the district court's actions were based on improper considerations. The Second Circuit held that the Coker action involved federal law questions, which could not be a basis for abstention. The Second Circuit, however, affirmed the district court's decision with regards to the Rosenkranz state-court action because the Court found that the two-step transfer plan would engender further delay and expense. The debtors in the *In re Pan Am* case did not seek transfer of the cases already before the MDL to the district court where the bankruptcy was pending.

The issue of abstention in relation to the MDL arose in *In re Apex Oil Co., supra.* There, the Court affirmed the district court's decision to abstain while the claimants' lawsuits proceeded in the multidistrict transferee court. The debtors in *Apex* had filed Chapter 11 bankruptcy in the Eastern District of Missouri. Acting under the authority of 28 U.S.C. § 1334(c)(1), the district court abstained from trying the claims, reasoning that the MDL had transferred the claims to the Eastern District of Pennsylvania. The bankruptcy stay was lifted so that the claimants could pursue their claims in the Eastern District of Pennsylvania. In *Apex*, the appellants claimed that the MDL had authority to transfer "lawsuits" only, but not bankruptcy claims, and that the district court's conclusion that their "claims" had been transferred was flawed. Reviewing that decision, the Eighth Circuit found that the distinction between lawsuits and claims does not negate the fact that the district court had the statutory authority to abstain while the claimants' lawsuits proceeded in the multidistrict transferee court. The Court wrote: "[e]ven though the 'claims' themselves may not have been transferred, we are not convinced that the district court should therefore be obliged to conduct duplicative proceedings in Missouri, thus squandering the very economies which are the purpose of the multidistrict transfer." 980 F.2d at 1153. The District Court's order requiring all claimants to proceed against the debtors in the MDL court in Pennsylvania was also affirmed, the Eighth Circuit reasoning that it served the same purpose as the original order requiring multidistrict coordination of the other related cases.

The relationship between sections 157(b)(5) and 1334(c)(1), the abstention statute, was addressed by the Sixth Circuit in *In re White Motor Credit*, 761 F.2d 270 (6th Cir.1985). The Sixth Circuit stated that in liquidating tort cases in bankruptcy, the district court should first decide whether to leave the cases with claims in the bankruptcy court in the courts where they are pending. If the Court decides against this course, the district court must then try the cases itself or send them to the federal court for the district in which they arose. *Id.* at 273. In *White Motor*, a confirmed plan of reorganization had already been established and only liquidation of damages was needed. The Sixth Circuit analysis is instructive in the instant case, even though the estimation process has not begun.

■■ The Debtor contends that the estimation process would be more accurate if a causation trial was held first. Claimants offer that the estimation process could be accomplished within 60 days. They argue that the estimation process can be guided by the outcome of several actual trials already held as well as the number and value of cases previously settled with the Debtor. The Claimants further assert that valuation of the various types of cases by diseases and injuries already exists as a result of the Global Settlement in the breast implant cases. One causation trial is not needed for the estimation process where information already exists

to accomplish the estimation process. The estimation should proceed before trial.

At oral argument, the Official Committee of Unsecured Creditors, arguing in favor of the transfer of all breast implant cases so that one causation trial can be held for the purpose of estimation, addressed four cases for the Court to use as a guide for this proposition. Cited as a model for the causation trial is *In re Bendectin Litigation,* 857 F.2d 290 (6th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989). In that case, the Sixth Circuit affirmed the district court's trifurcation of the issues involving a products liability action. Although the Sixth Circuit affirmed the decision to hold one trial on the causation only, the *Bendectin* case did not involve a bankruptcy claim and the estimation of certain unliquidated, contingent claims from personal injury tort claims.

A second case cited in support of the Debtor's position is *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285 (2nd Cir.1992). In that case, the district court approved a settlement agreement involving the debtor and a mandatory non-opt-out class of claimants. However, there was no issue of one causation trial for the purpose of estimation in that case. The *Drexel* case involved a settlement agreement pending confirmation of the debtor's reorganization plan. A causation trial was not involved in order to estimate the unliquidated and contingent claims in that case. It should also be noted that the *Drexel* case does not involve personal injury or wrongful death claims.

The third case is *Celotex Corp. v. Edwards,* —— U.S. ——, ——, 115 S.Ct. 1493, 1498–1499, 131 L.Ed.2d 403 (1995). The *Celotex* case only addresses the issue of whether or not the execution of a supersedeas bond based on a judgment in one district court is related to the debtor's bankruptcy pending in another district court. The case did not involve the issue of a causation trial held for the purpose of estimation.

The *A.H. Robins, supra,* is cited as the fourth case in favor of the transfer of cases and one causation trial for the purposes of estimation. In *A.H. Robins,* the Court noted that the bankruptcy court is not relieved of its duty in a Chapter 11 proceeding to estimate those contingent claims despite Section 157(b)(5) and before a trial is commenced. 788 F.2d at 1012. The Third Circuit stated:

> Section 157(b)(2)(B) excepts from the definition of 'core proceedings' personal tort claims against the debtor. The bankruptcy court is without authority under the Act over 'the liquidation or estimation of contingent or unliquidated personal injury or wrongful death claims against the estate for purposes of *distribution* under Title 11' 28 U.S.C. § 157(b)(2)(B). (Italics added) It will be observed, however, that the statute denies authority to the bankruptcy court to 'estimate' contingent claims only if the purpose is to make a 'distribution' of the assets of the debtor; the statute does not in express terms deny to the bankruptcy court the authority, or relieve it of the duty, to 'estimate' the contingent 'personal injury' claims for purposes of determining the feasibility of a reorganization. And such has been the construction of the statute which has been adopted by the courts which have had to face the issue, the two leading cases being proceedings arising out of the asbestos litigation. (cites omitted) Both of these cases hold that estimations of the debtors' potential personal injury tort liabilities as an incident of the development of a plan of reorganization are core proceedings within the bankruptcy court's jurisdiction and that such estimations are not foreclosed by Section 157(b)(5) of the Act. (footnote omitted)

This is not to say the personal claimants in this proceeding will not be ultimately entitled, if they elect to do so, to have a jury trial of their claim in the district court. Section 157(b)(5) gives them that right. But, even though the tort claimants may be entitled to their jury trials, the bankruptcy court *is not relieved of its duty in a Chapter 11 proceeding to estimate those contingent claims.* The real question thus arises as to which proceedings takes precedence, whether the estimation by the bankruptcy court of the claims or the jury trials in the district court of the claims. The authorities which have considered this question in connection with a

complicated products liability situation such as this are all unanimous. *The estimations of the potential and pending claims by the bankruptcy courts should precede any trials of the claims.*

788 F.2d at 1012 (emphasis added). Contrary to the proponents of the Debtor's motion to transfer and to hold a one causation trial for purposes of estimation, the *A.H. Robins* case states that the estimation process should occur first before any trials are held. The *A.H. Robins* court approved the district court's "tentative" order fixing the venue in the district court sitting in bankruptcy for all these claims. This Court finds the language in *A.H. Robins* does not foreclose this Court from ordering one or more causation trials to take place prior to the conclusion of the estimation process should the estimation process stall or if there is a need to test the accuracy of the estimation. Upon request of the Debtor. Claimants and/or the Bankruptcy Court this Court would entertain a subsequent motion to assist the estimation process by holding one or several trials. However, the estimation process must move forward first.

The Third Circuit Court further noted that having the estimation first before the trials would benefit all the claimants:

> ... If the claimants as a whole are to realize reasonable compensation for their claims, it is obviously in the interest of the class of claimants as a whole to obviate the tremendous expense of trying these cases separately. If the bankruptcy court could arrive at a fair estimation of the value of all the claims and submit a fair plan of reorganization based on such estimation, with some mechanism for dispute resolution and acceptable to all interested parties, great benefit to all the claimants could be achieved and the excessive expense of innumerable trials, stretching over an interminable time, could be avoided. (footnote omitted) ...

*In re A.H. Robins,* 788 F.2d at 1013. In remanding the matter for further notice and hearing, the *A.H. Robins* court was mindful of the importance in balancing the advantages and disadvantages of having the trial in one district court or leaving the case at the state level. 788 F.2d at 1014, 1016. This Court is mindful that one or more causation trials held during the estimation process for the purpose of assuring a more accurate estimation can best be accomplished if all cases pending against the Debtor are before one court, the district court where the bankruptcy is pending. Coordination is therefore assured.

The Court agrees with the finding in *A.H. Robins* that the Bankruptcy Court should first estimate the unliquidated, contingent tort injury claims before a trial is held. As the Claimants argue, the estimation process can be accomplished in a short period of time. The Debtor has the information needed to value the unliquidated tort injury claims.

The Court notes that both the Debtor and the Claimants agreed during oral arguments the one causation trial will not resolve all the issues between the Debtor and the Claimants. Issues including individual liability, rupture of implants, mechanical causation, and disfigurement would not be addressed if only one causation trial were held. Further trials will be needed to resolve these issues.

■■■■■ Pending trial or other resolution, any removed claims against the Debtor should be subject to the MDL panel and such claims will be transferred to the MDL Judge for pre-trial purposes which should not be inconsistent with the automatic stay of the Bankruptcy Court currently in effect as to the claims against the Debtor Dow Corning. All parties agree that the bankruptcy stay applies to all claims involving the Debtor. Therefore, there is no need to physically transfer the records of all the cases involving the Debtor to this District at this time. The Court also notes that many of the cases involving the Debtor are currently before the MDL judge. There is no need to waste resources of the court system, the Debtor and the Claimants with the physical transfer of all the case records involving the Debtor either to this District or the MDL transferee court. The Court will rely on the judgment of the transferee judge to request from the transferor district clerks or the parties whatever case files and docket sheets he needs. The Court is also aware that alternative reso-

lutions of many of the claims will occur prior to the liquidation/trial phase of the Debtor's bankruptcy which would obviate the need for physical transfer of the case records to this District for trial. Section 157(b)(5) does not mandate that all tort actions must be tried in district court, but only those which are not otherwise settled. *In re A.H. Robins,* 788 F.2d at 1013, n. 17. The Court further notes that unilateral dismissal of claims against a debtor under Fed.R.Civ.P. 41, or its equivalent by agreement and with judicial approval, assists rather than interferes with goals of Chapter 11. Such actions do not violate the automatic stay. *Chase Manhattan Bank, N.A. v. Celotex Corp.,* 852 F.Supp. 226, 228 (S.D.N.Y.1994). The MDL judge may enter such orders consistent with this Court's opinion and order.

The Court's decision that the estimation process should proceed without physically transferring the case files for one causation trial does not divest this Court of original and exclusive jurisdiction over the bankruptcy action pursuant to 28 U.S.C. § 1334(a). Should the Bankruptcy Court need more information for estimation purposes or reach the liquidation phase, the Court may again consider the issue of one or more causation trials should any party to the bankruptcy action request the Court to do so.

D. *Whether the claims against Dow Chemical Co. and Corning, Inc. should also be transferred to this Court and whether said claims are "related to" the Debtor's bankruptcy proceedings.*

▮▮▮▮▮ The Court has jurisdiction under 28 U.S.C. § 1334(b) to "all civil proceedings . . . related to cases under title 11." "Related to" jurisdiction includes actions involving non-debtors that could "conceivably" have an effect on the Debtor's bankruptcy case. *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984); *Robinson v. Michigan Consol. Gas Co. Inc.,* 918 F.2d 579, 583–584 (6th Cir.1990). In a recent Supreme Court case, the Court addressed the "related to" jurisdiction of the Court:

Congress did not delineate the scope of 'related to' jurisdiction, but its choice of words suggests a grant of some breadth. The jurisdictional grant in § 1334(b) was a distinct departure from the jurisdiction conferred under previous acts, which had been limited to either possession of property by the debtor or consent as a basis for jurisdiction. We agree with the views expressed by the Court of Appeals for the Third Circuit in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984), that 'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate,' and that the 'related to' language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than simple proceedings involving the property of the debtor or the estate.

*Celotex Corp. v. Edwards,* —— U.S. ——, ——, 115 S.Ct. 1493, 1498–1499, 131 L.Ed.2d 403 (1995).

As stated above, Dow Chemical and Corning, Inc. are each 50% shareholders ("Shareholders") of Dow Corning. According to Dow Chemical and Corning, Inc., they meet the "related to" test under § 1334(b). First, any judgment entered either for, or against either or both of the Shareholders will directly impact the Debtor's assets in bankruptcy. Any judgments against the Shareholders would generate claims for contribution against the Debtor which would need to be resolved as part of the bankruptcy plan process. Any judgment for the Shareholders would likely extinguish that plaintiff's claim against Dow Corning based on collateral estoppel. Second, the Shareholders' litigation will inevitably affect Dow Corning's rights under the insurance coverage it shares with either Shareholder, thereby diminishing the insurance available to the Debtor to fund a plan of reorganization and delaying the time that proceeds of insurance settlements will be available. Third, because it is the Debtor's product that will be on trial in any Shareholder litigation, the Debtor may claim it would need to participate actively in the defense and the costs of such participation would divert attention from the Debtor's reorganization both in terms of money and time.

In response, the Claimants assert that the Shareholders are large and healthy corporations that have no right to enjoy the protections afforded by bankruptcy. A bankruptcy filing does not bar an action against the principal of a debtor-corporation. *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir.1991). The Claimants further assert that the contribution claim by the Shareholders against the Debtor is theoretical at this time. In *Pacor, supra*, the Court held that the actions against the non-debtor would have no effect on the debtor's bankruptcy estate and therefore is not "related to" bankruptcy within the meaning of section 1471(b).[1] 743 F.2d at 995. The Third Circuit stated:

> ... At best, it is a mere precursor to the potential third party claim for indemnification by Pacor against Manville. Yet the outcome of the Higgins–Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor. Since Manville is not a party to the Higgins–Pacor action, it could not be bound by res judicata or collateral estoppel. (cites omitted) Even if the Higgins–Pacor dispute is resolved in favor of Higgins (thereby keeping open the possibility of a third party claim), Manville would still be able to relitigate any issue, or adopt any position, in response to a subsequent claim by Pacor. Thus, the bankruptcy estate could not be affected in any way until the Pacor–Manville third party action is actually brought and tried.

*Id.* at 995. The Third Circuit went on to state that without a judgment against the non-debtor, there could never be a third party indemnification claim against Manville. *Id.* The Claimants assert that a separate proceeding under 11 U.S.C. § 502 must be brought before the Bankruptcy Court if a judgment is rendered against the Shareholders.

Claimants state that if the real concern of the Shareholders is the fact that a certain insurance policy or policies are co-owned by the Debtor and Dow Chemical, then that issue should be brought to the Bankruptcy Court pursuant to *In the Matter of Vitek, Inc.*, 51 F.3d 530 (5th Cir.1995). The Fifth Circuit in that case reversed the district court and affirmed the bankruptcy court's approval of certain settlements, finding that the bankruptcy court had jurisdiction over liability insurance policies where the debtor was a co-insured with other parties. The Fifth Circuit noted that a bankruptcy estate includes a debtor's interest in liability insurance under 11 U.S.C. § 541(a)(1). *In the Matter of Vitek*, 51 F.3d at 533.

█ In the instant case, as in *Pacor*, there will be no contingent claim by the Shareholders against the debtor for indemnification until such time as a judgment is rendered and, then, the non-debtors would still have to proceed with an entirely separate proceeding in order to obtain indemnification from the Debtor under 11 U.S.C. § 502. Joint tortfeasors are not indispensable parties in the federal forum. *Lynch v. Johns–Manville Sales Corp.*, 710 F.2d 1194, 1198 (6th Cir.1983). The Bankruptcy forum provides for a mechanism to resolve the Debtor's liability for indemnification should a judgment be rendered against the Shareholders.

█ The insurance issue raised by the Shareholders is under the jurisdiction of the Bankruptcy Court pursuant to 11 U.S.C. § 541. Section 541 gives the Bankruptcy Court broad discretion over the Debtor's interest in a liability insurance policy where the Debtor is a co-insured with a non-debtor third-party. *In the Matter of Vitek*, 51 F.3d at 533. Given that there has been no judgment entered against the Shareholders, the Shareholders have no claim pending against the insurance policy at this time and there are currently no competing interests involved for the insurance funds as between the Debtor and its co-insured.

As to the Shareholders' argument that judicial economy would best be served if the cases against them were joined with the cases against the Debtor, the *Pacor* court has stated that "judicial economy itself does not justify federal jurisdiction." *Pacor*, 743

---

1. Section 1471 is now 28 U.S.C. § 1334.

F.2d at 994. This Court finds that judicial economy alone does not justify this Court exercising jurisdiction over the non-bankruptcy actions involving the Shareholders. The claims involving the Shareholders are not related to the bankruptcy action before the Court. The Court has no jurisdiction over those claims pursuant to 28 U.S.C. § 1334(b).

E. *Motions and proposed orders dismissing the Debtor and/or remanding claims involving Dow Chemical and Corning, Inc.*

■ Various Claimants in their responses to the Debtor's motion to transfer and during oral arguments indicate that there are motions and proposed orders seeking to dismiss or sever the Debtor and/or remand the claims involving Dow Chemical and Corning, Inc. currently pending either in the district court to which Dow Chemical and Corning, Inc. removed the cases or before the MDL judge.[2] Given this Court's ruling that it has no jurisdiction over the claims involving the Shareholders, those motions and/or orders to dismiss or sever the Debtor and/or remanding the claims to the state court should be addressed by the district court in which those claims are currently pending or by Judge Pointer if the case has been transferred to the MDL court. Furthermore, claims against the Shareholders currently pending before a state court should no longer be removed to the U.S. District Court if the only basis for removal is under 28 U.S.C. § 1334(b).

III. *CONCLUSION:*

This Court finds it has jurisdiction over all the opt-out breast implant claims against the Debtor Dow Corning pursuant to 28 U.S.C. § 1334(a) and this Court does not exercise its discretion to abstain from this jurisdiction. The Court also has the sole authority to fix the trial venue for any personal injury trials in this matter pursuant to 28 U.S.C. § 157(b)(5). For the purpose of determining the trial venue of the breast implant cases or furthering the estimation process, the Court

transfers the claims against the Debtor Dow Corning to this Court. However, the Court will not rule on the trial venue issue, at this time but will make that determination following the close of the estimation process. Pursuant to 28 U.S.C. § 157(b)(5), trial will either be here, in the district court in which the bankruptcy case is pending, or the district court in the district in which the claim arose as this Court may designate. The Court finds no physical transfer of case files or case records to the Eastern District of Michigan is necessary at this time and no such transfer should be made until further order of this Court.

Any removed claims against the Debtor will be subject to the MDL panel and such claims will be transferred to the MDL Judge for pre-trial purposes only (the setting of the trial venue having been reserved by this Court) and such pre-trial proceedings shall not be inconsistent with the automatic stay of the Bankruptcy Court which is currently in effect as to the claims against the Debtor Dow Corning. Although Panel Rule 19(a) requires clerks of the transferor district courts to forward to the clerk of the transferee district court the complete original file and docket sheet for each transferred action, because of the voluminous files, the transferee MDL judge will determine whatever case files and docket sheets he needs from the transferor district clerks.

The Bankruptcy Court should proceed with its estimation process regarding these claims. However, a causation trial at this stage of the proceedings is not necessary. The Court does not foreclose its discretion or authority to hold such a trial or trials at any point in the estimation process for the purpose of furthering or assisting the process should it be called upon to do so. Such motions should be addressed to this Court.

The Court finds it has no jurisdiction over the claims against the non-debtors Dow Chemical and Corning, Inc. and denies the Debtor's motion to transfer these claims. Claims against the non-debtors shall be remanded to state courts if the only basis for

---

**2.** The Court notes that its July 5, 1995 Order Provisionally Transferring Certain Breast Implant Cases to this Court pending a hearing spe-

cifically stayed actions involving the Debtor, Dow Corning and did not stay any proceedings as to Dow Chemical or Corning.

removal is the Court's "related to" jurisdiction. The Debtor Dow Corning shall be dismissed or may be severed from the claims against it and other non-debtor defendants in accordance with this opinion and claimants shall be allowed to proceed as scheduled against the non-debtors. Claims against the Debtor continue to be stayed pursuant to the automatic stay of the Bankruptcy Court.

Accordingly,

IT IS ORDERED that the Court has jurisdiction over all the opt-out breast implant claims against the Debtor Dow Corning pursuant to 28 U.S.C. § 1334(a) and is not exercising its discretion to abstain from this jurisdiction;

IT IS FURTHER ORDERED that the Court has the sole authority to fix the trial venue for any personal injury trials in this matter pursuant to 28 U.S.C. § 157(b)(5) and the Court GRANTS the Debtor's motion to transfer the opt-out breast implant cases for the purposes of setting the trial venue of the claims against the Debtor or furthering the estimation process if necessary. The Court will determine following the close of the estimation process, whether the trial venue of the personal injury tort claims, will be either in this Court, the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose pursuant to 28 U.S.C. § 157(b)(5);

IT IS FURTHER ORDERED that any removed claims against the Debtor will be subject to the MDL panel and such claims will be transferred to the MDL Judge for pre-trial purposes only (the setting of the trial venue having been reserved by this Court) and such pre-trial proceedings shall not be inconsistent with the automatic stay of the Bankruptcy Court which is currently in effect as to the claims against the Debtor Dow Corning. Although Panel Rule 19(a) requires clerks of the transferor district courts to forward to the clerk of the transferee district court the complete original file and docket sheet for each transferred action, because of the voluminous files, the transferee MDL judge will determine whatever case files and docket sheets he needs from the transferor district clerks;

IT IS FURTHER ORDERED that no physical transfer of case files or case records to the Eastern District of Michigan should take place at this time nor until further order of this Court;

IT IS FURTHER ORDERED that the motion of the Debtor Dow Corning to transfer the breast implant cases for the purpose of holding one causation trial prior to the estimation process is DENIED without prejudice at this time, the Court reserving its authority to hold such a trial or trials to further the efforts of the estimation process;

IT IS FURTHER ORDERED that the Bankruptcy Court should proceed with an estimation process required by 11 U.S.C. § 502(c);

IT IS FURTHER ORDERED that the Debtor's motion to transfer the breast implant claims against the non-debtors Dow Chemical and Corning, Inc. to the Eastern District of Michigan is hereby DENIED;

IT IS FURTHER ORDERED that motions and proposed orders seeking to dismiss or sever the Debtor from claims against other breast implant defendants pending in either state courts or in federal district courts should be GRANTED and an order should be entered by those respective courts in accordance with this opinion and order;

IT IS FURTHER ORDERED that the claims against the non-debtors Dow Chemical and Corning, Inc. which have been removed to federal district courts shall be REMANDED to the respective state courts if the only basis for removal is 28 U.S.C. §§ 1334(b) or 1367(a);

IT IS FURTHER ORDERED that the claims against the Debtor Dow Corning continue to be stayed pursuant to the automatic stay of the Bankruptcy Court until further order of the Bankruptcy Court;

IT IS FURTHER ORDERED that the time for removal of the opt-out breast implant claims pursuant to Bankruptcy Rule 9027(a)(2)(A) against the Debtor Dow Corning be enlarged to 30 days from the date of this Order or the Debtor Dow Corning may remove the claims 30 days after entry of an order terminating the stay pursuant to Bankruptcy Rule 9027(a)(2)(B);

IT IS FURTHER ORDERED that the MDL Judge may enter orders to remand, to dismiss and to sever any claims against non-debtors, including the Shareholders, in accordance with this Opinion and Order.

### SUPPLEMENTAL ORDER TO THE COURT'S SEPTEMBER 12, 1995 ORDER

■ This matter is now before the Court on the Debtor Dow Corning Corporation's Motion to Extend the Removal Deadline for Opt–In Claims and Non–Breast Implant Product Claims. The Court notes that the September 12, 1995 Order only applied to the Debtor's motion to transfer opt-out breast implant cases. Finding that the same analysis on the removal and transfer issues would also apply to the opt-in claims, this Court supplements its September 12, 1995 Order to include the opt-in claims against the Debtor Dow Corning.

■ As to the Debtor Dow Corning's motion to extend the removal of non-breast implant product claims, this is the first time that the Court has been notified that the Debtor has contemplated this action. The numerous pleadings filed in the above-captioned case number and the lengthy hearing on July 31, 1995 relating to the Debtor Dow Corning's motion to transfer did not address removals of non-breast implant product claims.[1] The Court's previous orders have not applied to non-breast implant product claims except to the extent that certain opt-out non-breast implant claims were included in the Debtor's schedule A attached to the original motion to transfer. The Court finds that the Debtor Dow Corning's motion to transfer non-breast implant product claims is untimely, filed well past the original 90–day time for removing under Rule 9027(a)(2)(A)[2] of the Bankruptcy Rules. The Court further finds that the Debtor has waived its right to

remove the non-breast implant product claims under Rule 9027(a)(2)(A).

Accordingly,

IT IS ORDERED that the Debtor Dow Corning's motion to extend the time for removal of opt-in breast implant claims is hereby GRANTED;

IT IS FURTHER ORDERED that the opt-in claims be subject to the Court's September 12, 1995 Order; and

IT IS FURTHER ORDERED that the Debtor Dow Corning's motion to extend the time for removal of non-breast implant claims is hereby DENIED.

---

1. The Court notes that the issue of extending the time to remove both opt-out and opt-in breast implant cases was discussed at the July 31, 1995 hearing. (*See* July 31, 1995 hearing transcript, pp. 211–225). Specifically, as to the opt-in claimants, an attorney for the opt-in claimants stated that a stipulation to enlarge the time for removal on behalf of the opt-in claimants could be accomplished. (July 31, 1995 hearing transcript, p. 225).

2. The Court notes that Rule 9027(a)(2)(B) allows the Debtor to remove a claim 30 days after entry of an order terminating a stay, if the claim has been stayed under § 362 of the Code.